FILED

## IN THE UNITED STATES DISTRICT COURT   2018 MAR -6  PM 1: 39
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA

ANTHONY RYAN SARTORI and
TRACI ANN SARTORI,

      Plaintiffs,

vs.                          **Case No.: 2:18-cv- 147    -FtM- 29MRM**

KEVIN RAMBOSK, in his Official Capacity as Sheriff
of Collier County, Florida,
GREGORY GOSSELIN, individually,
WILLIAM McCLELLAND, individually,
DALE DEAR, individually, ROBERT LEWIS, III, individually,
J.J. CARROLL, individually,
JACQUES PAN-KITA, individually and
ROBERT GUTH III, individually,

      Defendants.
_____/

## COMPLAINT and DEMAND FOR JURY TRIAL

COME NOW, Plaintiffs, ANTHONY RYAN SARTORI and TRACI ANN SARTORI,

by and through their undersigned counsel, and pursuant to Fed. R. Civ. P. 7(a), and file this

Complaint and Demand for Jury Trial, and sue Defendant KEVIN RAMBOSK, in his official

capacity as Sheriff of Collier County, Florida, and Defendants GREGORY GOSSELIN,

individually, WILLIAM McCLELLAND, individually, DALE DEAR, individually, ROBERT

LEWIS, III, individually, J.J. CARROLL, individually, JACQUES PAN-KITA, individually and

ROBERT GUTH III, individually, for injuries and damages to their persons and for the unlawful

deprivation of their rights guaranteed under the Fourth and Fourteenth Amendments to the

Constitution of the United States, and allege as follows:

## JURISDICTIONAL ALLEGATIONS

1.      This is an action brought pursuant to Title 42 U.S.C. Section 1983, and Title 28 U.S.C.

Section 1343, seeking damages including costs of litigation and reasonable attorney fees, against

Defendants KEVIN RAMBOSK, GREGORY GOSSELIN, WILLIAM McCLELLAND, DALE

DEAR, ROBERT LEWIS, III, J.J. CARROLL, JACQUES PAN-KITA and ROBERT GUTH, III,

for committing acts, under color of state law, which deprived Plaintiffs of their rights secured by

the Fourth and Fourteenth Amendments to the Constitution and laws of the United States.  This

Court has original jurisdiction pursuant to Title 28 U.S.C. §§ 1331 and 1367.

2.      Plaintiffs also seek the Supplemental Jurisdiction of this Court, pursuant to 28 U.S.C.

1367, against Defendants KEVIN RAMBOSK, GREGORY GOSSELIN, WILLIAM

McCLELLAND, DALE DEAR, ROBERT LEWIS, III, J.J. CARROLL, JACQUES PAN-KITA

and ROBERT GUTH, III, for acts committed under the common law and statutes of the State of

Florida, in that such claims derive from a common nucleus of operative facts and are so related to

the claims in this action within the Court's jurisdiction, that they form part of the same case or

controversy.

3.      The violations of Plaintiffs' rights alleged herein were committed within Collier County,

Florida, and venue is proper in this district pursuant to U.S.C. Section 1391(b).

4.      All conditions precedent required by Florida law for the filing of this Complaint,

including notification of certain Defendants and the Florida Department of Financial Services

pursuant to Section 768.28, *Florida Statutes,* of any state law claims, have been met.

## PARTIES

5.      At all relevant times, Plaintiff, ANTHONY RYAN SARTORI ("ANTHONY"), was a

citizen of the United States of America and was, therefore, entitled to all legal and constitutional

rights afforded citizens of the United States.  On October 22, 2014, ANTHONY experienced a

seizure and Defendants GREGORY GOSSELIN, WILLIAM McCLELLAND and DALE DEAR,

responded to a 911 call to ANTHONY'S Collier County residence and, as result of their

responses to the 911 call, ANTHONY suffered permanent injury and damages.

6.      At all relevant times, Plaintiff, TRACI ANN SARTORI ("TRACI"), was a citizen of the

United States of America and was, therefore, entitled to all legal and constitutional rights

afforded citizens of the United States.  On October 22, 2014, TRACI was the wife of

ANTHONY and the mother of his children and when ANTHONY experienced a medical seizure

TRACI called 911 for emergency medical assistance.  Defendants GREGORY GOSSELIN,

WILLIAM McCLELLAND, DALE DEAR, ROBERT LEWIS, III, JJ CARROLL, JACQUES

PAN-KITA and ROBERT GUTH III responded to her 911 call and, as result of their responses to

her call TRACI was damaged.

7.      At all relevant times, including October 22, 2014, Defendants GREGORY GOSSELIN,

WILLIAM McCLELLAND, DALE DEAR, ROBERT LEWIS, III, JJ CARROLL, JACQUES

PAN-KITA and ROBERT GUTH III  were employed by the Collier County Sheriff's Department

and were acting individually, as well as under color of authority of the laws of the State of

Florida.  At all relevant times, these Defendants were trained in police work, including, but not

limited to, the Fourth and Fourteenth Amendments to the Constitution of the United States,

lawful seizure, limitations placed on the use of force and the right to access to medical care.

8.      At all relevant times, including October 22, 2014, Defendant KEVIN RAMBOSK was

employed by the Collier County Sheriff's Department, was the senior law enforcement officer in the Collier County Sheriff's Department and was acting in his official capacity as Sheriff under color of authority of the laws of the State of Florida.

9.    Defendants GREGORY GOSSELIN, WILLIAM McCLELLAND, DALE DEAR, ROBERT LEWIS, III, JJ CARROLL, JACQUES PAN-KITA and ROBERT GUTH III, at all times material to this action, were engaged in activities best described as "operational" level decision-making within the Collier County Sheriff's Department. In as much as these activities do not fall into the category which involves broad policy making or planning and hence do not involve discretionary governmental functions, the actions of the Defendants named in this paragraph are not immune from tort liability under the provisions of Section 768.28, *Florida Statutes*, and the Constitution of the State of Florida.

## FACTUAL ALLEGATIONS

10.    On October 22, 2014, at about 3:17 AM, TRACI heard ANTHONY, her husband, making very loud noises. TRACI called 911 and told the call-taker she thought her husband was having a seizure. While he was not awake, his eyes were open and "freaky" and he was jerking and sweating and his hands were clenched. He sounded like he was vomiting but he wasn't actually vomiting. He kept trying to get out of the bed.

11.    TRACI also told the 911 call-taker ANTHONY was 31, conscious and breathing, but through clenched teeth, had not had more than one seizure in a row when she called 911, was not diabetic, was not an epileptic or diagnosed with a seizure disorder and did not have a history of stroke or brain tumor. She told the call-taker that he had taken no medication or illegal drug.

12.    The call-taker instructed TRACI to try and keep ANTHONY on his side, keep him where

he was on the bed in the bedroom and not let him get up, remove the pillows, count his breaths, check for vomiting and stay with him. TRACI was instructed not to hold him down. At one point, while TRACI was talking to the call-taker, ANTHONY seemed to go to sleep, then he rolled over and said, "Traci, help me" and started making the loud noises again. The call-taker told TRACI help was on the way.

13.    TRACI heard a knock on her door and the sound of her dog barking and got off the bed to answer the door. As soon as she got off the bed, ANTHONY rolled and fell out of the bed. He tried to walk but stumbled and fell to the floor after hitting his head on the nightstand. TRACI ran to unlock the door.

14.    ANTHONY, who was naked except for plaid boxer shorts, stumbled out of the bedroom behind TRACI and into the living room area. He was at least fifteen feet from the front door which was located the other end of an "entry hall" formed by the living room wall and a couch. He was disorientated and stumbling and was not moving in the direction of the front door or in any particular direction. Their fifteen month old twin son and daughter were asleep in a bedroom on the other side of the living room and the twins' play area was set up in the middle of the living room which is a large and uncluttered space. The play area had a padded floor and was enclosed by low plastic "fence."

15.    When TRACI opened the door, Defendants GREGORY GOSSELIN ("GOSSELIN") and WILLIAM McCLELLAND ("McCLELLAND") were standing there, with a flashlight shining into the room. They had to navigate around the children's toys in the front yard to get to the front door.

16.    TRACI was told by the officers to restrain her dog (a yellow lab), and because she

thought the officers had arrived to help ANTHONY, when the dog ran out the open door, she ran after him.

17.    Defendants GOSSELIN and McCLELLAND had been informed by dispatch that ANTHONY was having a grand mal seizure.  They immediately notified dispatch that it was "possible excited delirium" a non-specific behavior response law enforcement associate with drug use.

18.    Defendants GOSSELIN and McCLELLAND claim ANTHONY approached the officers, stumbled and fell to the ground and was loudly ordered to remain on the ground by Defendant GOSSELIN.  When he got back up, the officers claim ANTHONY took a "fighting stance" and clenched his fist and came toward Defendant GOSSELIN before falling to the ground again.

19.    TRACI states ANTHONY was too disoriented to take any stance since he could barely stand up and could not move in any direction of his own volition. His fists had been clenched since she was first awakened by sound of his seizure.

20.    When ANTHONY got back up after falling again, Defendant GOSSELIN deployed his taser because ANTHONY refused to comply with his order and again instructed ANTHONY to get on the ground.  Defendant GOSSELIN claims ANTHONY, who could not even stand up, then "charged" toward Defendant McCLELLAND and swung at him and missed and Defendant GOSSELIN fired his TASER again, striking ANTHONY in the back.  ANTHONY again fell to the ground.  Defendant GOSSELIN, who was in ANTHONY'S home in response to a 911 call for a seizure, administered another taser cycle, and another, and another until he had discharged his taser seven times for a total of 75 seconds of electrical exposure to ANTHONY in less than two minutes.

21.    TRACI rejects any claim that ANTHONY "charged" anyone or took a "swing" at anyone; he was capable of nothing but clumsy, unconscious and haphazard movements.

22.    After ANTHONY had fallen from one of the taser discharges, Defendants GOSSELIN and McCLELLAND attempted to "control" ANTHONY'S legs and upper body by physically laying on top of him while he was face down on the tile floor.[1] Defendant GOSSELIN decided the taser was having minimal effect so he holstered the taser and the two officers handcuffed ANTHONY while he continued to struggle involuntarily and unconsciously. Defendant DALE DEAR ("DEAR") who had responded to the chaos created by Defendants GOSSELIN and McCLELLAND, assisted Defendants GOSSELIN and McCLELLAND in getting ANTHONY into handcuffs. During the entire encounter ANTHONY was making incoherent, guttural sounds and sweating profusely. Defendant GOSSELIN later asked TRACI if ANTHONY spoke Mandarin.

23.    While TRACI was outside retrieving their dog, she thought she heard the officers yell "Cops and calm down" before she heard ANTHONY scream multiple times. She ran back to the front door, without their dog, and saw Defendants GOSSELIN and McCLELLAND holding ANTHONY face down on the floor and yelling at him, "stay down." She saw at least one taser prong in ANTHONY'S back. The officers did not ask her assist them in calming her husband down.

24.    TRACI told Defendants GOSSELIN and McCLELLAND she needed to get her phone to call ANTHONY'S mom but they told TRACI to stay away and leave the scene. More officers came into her home, so TRACI walked around the officers and into the bedroom to get her

---

[1]    This is known as "prone restraint."

phone. The 911 call-taker was still on the line and TRACI told her she was hanging up to call ANTHONY'S mom.

25.     TRACI was standing in the bedroom doorway trying to call ANTHONY'S mom when an officer, in a loud and aggressive voice, demanded to know who she was calling. She told him who she was calling and then twice more he demanded to know who she was calling. By now, there were at least 6-10 officers in her home.

26.     "Due to ANTHONY'S actions and state of mind," the officers finally allowed EMS to come on scene and evaluate ANTHONY. When EMS came to the front door, Defendants GOSSELIN, McCLELLAND and DEAR were attempting to hog-tie ANTHONY but were stopped by EMS.

27.     TRACI provided ANTHONY'S name, date of birth and social to EMS. They asked if ANTHONY had taken anything and she told them he had smoked pot nineteen hours earlier. TRACI observed EMS come into the house twice with a syringe. EMS admits giving 2.5 mg of Versed, IN and 2.5 mg of Versed IM to ANTHONY but does not know how much Versed ANTHONY actually received.

28.     In a Response to Resistence Report, Defendant GOSSELIN claimed that ANTHONY "attacked the deputies," was on "unknown drugs" and was uninjured by their use of force and that TRACI ran away to the bedroom when ANTHONY became "combative." None of this was true.

29.     Despite being dispatched to a grand mal seizure, the EMS Report fails to even mention the word seizure, but does note "unknown as to other drugs patient might have ingested." The EMS Report states that when officers arrived ANTHONY was "actively chasing his wife," and

Page 8 of 39

stated ANTHONY was coming after the deputies, "leaving them no choice but to apprehend him" and that during the apprehension, ANTHONY was tased twice. EMS had no actual knowledge that any of this happened, but was briefed by Defendants GOSSELIN, McCLELLAND and DEAR and conveyed the same information to the hospital. It is all contrary to TRACI'S version of events and untrue.

30.    ANTHONY was placed on a stretcher, in handcuffs, and transported to Naples Community Hospital by EMS.

31.    ANTHONY'S parents arrived at the hospital before EMS arrived with ANTHONY. Defendant McCLELLAND approached them and inquired about ANTHONY'S drug use, including "meth" and "coco puffs." They had never heard of "coco puffs" and they informed the officer that ANTHONY did not do drugs. Defendant McCLELLAND claimed to them that "ANTHONY went after him."

32.    When ANTHONY'S parents asked the hospital for an update on their son, they were told "the police were in charge" and the staff could not speak to them about their son.

33.    The ER doctor who conferred first with Defendant McCLELLAND and EMS, questioned ANTHONY'S parents about his drug use, including performance enhancers and bath salts. The EMS doctor finally admitted that ANTHONY "might" have experienced a temporal lobe seizure.

34.    When his parents were finally allowed to see ANTHONY, they observed dried blood on his mouth, nose and chest and that he was in a lot of pain. He had bruises on his face, including a large bruise on his forehead and another large bruise on his left temple. He had multiple large bruises in his kidney area indicative of multiple fist strikes, and bruises on his knees and left

lower side. Both his wrists were cut, swollen and bruised and there were red and bloody indentations on his wrists from the handcuffs. The marks from the taser probes were clearly visible on his back. ANTHONY was very confused, could not feel with his hands and was unable to move his right arm without using his left hand to pick up his arm. He was also wearing a cervical collar.

35.    TRACI'S sister cleaned up ANTHONY'S blood on the living room floor. It was nowhere near the kitchen and in an open area in the middle of the living room. The deputies recovered an unknown number of taser tabs from the living room and took them with them, claiming they were concerned about the children finding them.

36.    ANTHONY was diagnosed with a focal onset frontal greater than temporal seizure with secondary generalization. There were no drugs in his system upon admission and the marijuana he had smoked nineteen hours earlier had nothing to do with ANTHONY'S seizure or postictal[2] response.

37.    ANTHONY was never placed under arrest and was not charged with committing any crime.

## FEDERAL CLAIMS

## COUNT I

### Violation of Civil Rights of ANTHONY SARTORI Against GREGORY GOSSELIN, WILLIAM McCLELLAND and DALE DEAR for Unlawful Seizure Pursuant to 42 U.S.C. §1983

38.    Plaintiff realleges the allegations of paragraphs 10-37, above, as if fully set forth herein and further alleges:

---

[2]    Postictal state is the altered state of consciousness following the seizure.

39.    Defendants GOSSELIN, McCLELLAND and DEAR violated the clearly established and well-settled federal constitutional rights of ANTHONY, including, but not limited to, his Fourth and Fourteenth Amendment rights of:

a.    Freedom from unreasonable seizure of his person;

b.    Freedom from illegal detention and deprivation of his liberty without due process of law; and

c.    Access to medical care.

40.    Defendants GOSSELIN, McCLELLAND and DEAR acted under color of state law in depriving ANTHONY of his right to be free from unlawful seizure in his home and otherwise deprived him of his right of due process of law in violation of the Constitution of the United States.

41.    When Defendants GOSSELIN, McCLELLAND and DEAR entered ANTHONY'S home they were engaged in the operational task of responding to a 911 call for medical assistance for a medical seizure and none of the officers that entered ANTHONY'S home were engaged in any duty related to the duty to investigate and uncover criminal activity.  As such, their actions did not fall within the scope of their discretionary authority.

42.    Defendants GOSSELIN, McCLELLAND and DEAR were dispatched to ANTHONY'S home to help ANTHONY because the officers were told he was having a medical seizure and in need of emergency medical assistance.  They found an almost naked, confused and incoherent ANTHONY sweating profusely, stumbling and falling and making strange guttural sounds; all signs of either an active seizure or postictal state.  ANTHONY had not committed a crime or threatened anyone, was not suspected of committing any crime, clearly had no weapon on his

person, was not fleeing his own home and was not a danger to the community or the officers.

43.     Instead of following well-established emergency medical procedures for a person who was having a medical seizure or was in a postictal state, which required them to keep ANTHONY calm and clear the area until his seizing or postictal confusion resolved, and instead of following the only written Sheriff's Department training protocol for a person experiencing a seizure which prohibited restraint of the person, Defendants GOSSELIN, McCLELLAND and DEAR created further danger to ANTHONY by loudly issuing orders to ANTHONY he could not understand or respond to and then restraining ANTHONY when he failed to comply with the orders, causing predictable postictal reactive aggressive behavior.  They further increased the danger to ANTHONY and exacerbated his serious medical condition by tasing his multiple times, holding him face down on the floor and placing themselves physically on top of him "to try and keep him still," apparently completely oblivious to the fact that ANTHONY'S movements were entirely involuntary.  They handcuffed ANTHONY against the involuntary movements of his body and were trying to hog-tie him before being warned not to further restrain ANTHONY by EMS.

44.     Their actions exacerbated ANTHONY'S serious medical condition, delayed the entry of EMS into his home and delayed his access to medical care.

45.     The only justification for the initial unwarranted and unlawful seizure of ANTHONY was the manufactured excuse that ANTHONY was acting "aggressively" in swinging wildly with his arms at the officers while he was stumbling and falling in his living room and that he refused to comply with their orders to "get on the floor."  They also claimed they were in a home with a kitchen and ANTHONY had access to potential weapons in his kitchen.  No officer claimed to be in fear for his safety.

46.    Despite being told by dispatch that ANTHONY was having a grand mal seizure, Defendant McCLELLAND said they wanted ANTHONY to stay on the ground because they weren't sure it was a medical emergency "or what the deal was." After ANTHONY was tased multiple times, Defendant McCLELLAND decided, based on his "training and experience" it was not a medical issue but some kind of "substance."

47.    Once the officers engaged ANTHONY and wrestled him to the floor, they justified their continued unlawful seizure of ANTHONY because he struggled and "tensed" against their efforts to restrain him, classic symptoms of the involuntary movements associated with a medical seizure and postictal state of seizure. The officers admitted ANTHONY was not "throwing punches or anything" but was constantly struggling to get up. When Defendants GOSSELIN and McCLELLAND couldn't contain ANTHONY, they called for "more hands" and Defendant DEAR stepped in to help.

48.    Defendant McCLELLAND put handcuffs on ANTHONY because he said they had to get ANTHONY under control and restrained "so EMS could come in and determine what was going on with him," all the while endangering ANTHONY'S life and preventing him from receiving the medical assistance that had been requested and promised when TRACI called 911.

49.    The unlawful seizure of ANTHONY continued after he was transported to the hospital where staff were told by Defendant McCLELLAND that ANTHONY was in the custody of the Collier County Sheriff.

50.    ANTHONY had not committed a crime or threatened anyone, was not suspected of committing any crime, clearly had no weapon on his person, was not fleeing his own home and was not a danger to the community or the officers and the unlawful seizure of ANTHONY

without probable cause was unreasonable and unwarranted under the circumstances and a violation of ANTHONY'S constitutional rights under the Fourth and Fourteenth Amendments. It was not objectively reasonable for Defendants GOSSELIN, McCLELLAND and DEAR to believe their actions did not violate the law and no reasonable officer would have believed it was necessary to issue any order to ANTHONY, much less use force on him when he was non–compliant with an order he could not understand and was a danger to no one.

51.    As a direct and proximate result of the unconstitutional conduct of GREGORY GOSSELIN, WILLIAM McCLELLAND and DALE DEAR, ANTHONY has suffered damages including bodily injury and the resulting physical pain and suffering, post traumatic stress disorder, emotional distress and mental anguish and suffering, and he has suffered the loss of his capacity for the enjoyment of life. Some of ANTHONY'S injuries are permanent or continuing and he will continue to suffer in the future.

52.    ANTHONY has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendants GREGORY GOSSELIN, WILLIAM McCLELLAND and DALE DEAR pursuant to the provisions of 42 U.S.C. Section 1983.

   **WHEREFORE**, Plaintiff, ANTHONY RYAN SARTORI demands judgment for damages against Defendants GREGORY GOSSELIN, WILLIAM McCLELLAND and DALE DEAR, together with pre-judgment interest, interest, attorneys fees, costs of the action, and TRIAL BY JURY.

## COUNT II

### Violation of Civil Rights of ANTHONY SARTORI Against GREGORY GOSSELIN and WILLIAM McCLELLAND for Excessive and Potentially Deadly Force Pursuant to 42 U.S.C. §1983

53.     Plaintiff realleges the allegations of paragraphs 10-37 above, as if fully set forth herein and further alleges:

54.     GREGORY GOSSELIN and WILLIAM McCLELLAND violated the clearly established and well-settled federal constitutional rights of ANTHONY, including, but not limited to, his Fourth Amendment right of freedom from the use of unreasonable, excessive and potentially deadly force.

55.     Defendants GOSSELIN and McCLELLAND acted under color of state law in depriving ANTHONY of his right to be free from the use of unreasonable, excessive and potentially deadly force and otherwise deprived him of due process of law in violation of the Fourth Amendment to the Constitution of the United States.

56.     When Defendants GOSSELIN and McCLELLAND entered ANTHONY'S home, they were engaged in the operational task of responding to a 911 medical emergency call made by ANTHONY'S wife who feared ANTHONY was having a medical seizure. Defendants GOSSELIN and McCLELLAND were not engaged in any duty related to the duty to investigate and uncover criminal activity, as such their actions did not fall within the scope of their discretionary authority. Defendant GOSSELIN said they responded to the 911 call because law enforcement can get to a patient quicker and address any breathing problems or heart related problems and they have basic first aid techniques like AED and can provide "some assistance" prior to EMS arrival.

57.    Defendant GOSSELIN described ANTHONY, who was wearing nothing but boxer shorts as falling down, sweating profusely and making strange guttural sounds. He said the look in ANTHONY'S eye wasn't normal.

58.    When ANTHONY fell down, Defendant GOSSELIN said he ordered ANTHONY to stay down and when ANTHONY got up and took a "fighting stance with a clenched fist" he was being combative toward the deputies. He tased ANTHONY the first or second time when he claimed ANTHONY "charged" Defendant McCLELLAND.

59.    Defendants GOSSELIN and McCLELLAND did not claim they were in fear for their safety, instead they claimed they wanted "control" of ANTHONY so Defendant GOSSELIN tased him seven times, deploying 75 seconds of electrical exposure to ANTHONY in less than two minutes. Defendants GOSSELIN and McCLELLAND never claimed ANTHONY was suspected of or had committed any crime, possessed any weapon or was a danger to the public when they tased ANTHONY seven times, handcuffed him and attempted to hog-tie him.

60.    Defendant GOSSELIN said he wanted to get control of ANTHONY so "nobody else got hurt, or he got hurt" despite the fact that at the time ANTHONY was tased no one had been hurt. Defendant McCLELLAND wanted to get control because ANTHONY was in a house with a kitchen that had "potential weapons." He never claimed ANTHONY was anywhere near the kitchen, or the "potential weapons," or that ANTHONY could have used any "potential weapon" in his present physical condition.

61.    After ANTHONY received the initial or second tasing and he was on the floor, Defendants GOSSELIN and McCLELLAND subjected ANTHONY to additional life-threatening restraint procedures when they decided to handcuff him by holding ANTHONY down with their combined

body weight on his upper torso and legs (prone restraint), and continuing to tase him a total of seven times for 75 seconds in less than two minutes. The physical evidence shows that ANTHONY also endured a series of fist strikes to his kidney, another force application to gain compliance through the use of pain. After the postictal ANTHONY was handcuffed and continued what were involuntary movements, the officers tried to hog-tie him and only stopped because EMS intervened.

62.    People like ANTHONY, suffering from a medical seizure or recovering from a medical seizure and exhibiting predictable involuntary aggressive behavior have died after being shocked and subjected to other forms of restraint such as handcuffing and prone restraint. Restraint of a person during or soon after a medical seizure may exacerbate or precipitate combativeness, seizure-related agitation and struggling, as well as risk injury or death.

63.    The taser was used not because ANTHONY represented any significant threat to law enforcement or the public but simply to subdue a non-complaint person who had committed no crime and Defendant GOSSELIN only stopped using the taser because he decided it was ineffective. When he deployed the TASER he had been in ANTHONY'S home no longer than "a minute or two." It was not objectively reasonable for Defendant GOSSELIN to believe tasing ANTHONY seven times for 75 seconds in less than two minutes, did not violate the law.

64.    Defendants GOSSELIN and McCLELLAND used painful electric shocks and deadly prone restraint on an individual who did not comply immediately with instructions but who had no weapon, had not committed any crime and who did not pose a threat of serious physical harm to the officers or others. They acted in a law-enforcement rather than medical response capacity toward a person suffering a serious medical emergency. Every reasonable officer would have

thought such force was plainly unlawful and unreasonable under the circumstances.

65.    By using unnecessary, disproportionate and excessive and potentially deadly force that was unreasonable under the circumstances against ANTHONY, had not committed a crime or threatened anyone, was not suspected of committing any crime, clearly had no weapon on his person, was not fleeing his own home and was not a danger to the community or the officers, and by depriving him of access to medical care while they "controlled" him, Defendants GOSSELIN and McCLELLAND created a further danger to ANTHONY and violated ANTHONY'S well-established rights guaranteed under the Fourth and Fourteenth Amendments of the Constitution of the United States.

66.    The acts of Defendants GOSSELIN and McCLELLAND deprived ANTHONY of his right to be free from the use of excessive and potentially deadly force and his right to access medical care and otherwise deprived ANTHONY of due process of law and every reasonable officer in the position of Defendants GOSSELIN and McCLELLAND would have concluded such force was unreasonable and unlawful under the circumstances.

67.    As a direct and proximate result of the unconstitutional conduct of Defendants GOSSELIN and McCLELLAND, ANTHONY has suffered damages including bodily injury and the resulting physical pain and suffering, post traumatic stress disorder, emotional distress and mental anguish and suffering, and he has suffered the loss of his capacity for the enjoyment of life. Some of ANTHONY'S injuries are permanent or continuing and he will continue to suffer in the future.

68.    ANTHONY has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from Defendants GREGORY GOSSELIN and WILLIAM McCLELLAND pursuant to the provisions

of 42 U.S.C. Section 1983.

**WHEREFORE**, Plaintiff, ANTHONY RYAN SARTORI demands judgment for damages against Defendants GREGORY GOSSELIN and WILLIAM McCLELLAND, together with pre-judgment interest, interest, attorneys fees, costs of the action, and TRIAL BY JURY.

## COUNT III

### Violation of Civil Rights of TRACI SARTORI Against GREGORY GOSSELIN, WILLIAM McCLELLAND, DALE DEAR, ROBERT LEWIS, III, J.J. CARROLL, JACQUES PAN-KITA and ROBERT GUTH, III for Unlawful Seizure Pursuant to 42 U.S.C. §1983

69.    Plaintiff realleges the allegations of paragraphs 10-37 above, as if fully set forth herein and further alleges:

70.    Defendants GREGORY GOSSELIN, WILLIAM McCLELLAND, DALE DEAR, ROBERT LEWIS, III, J.J. CARROLL, JACQUES PAN-KITA and ROBERT GUTH, III, while acting under color of state law, violated the clearly established and well-settled federal constitutional rights of TRACI, including, but not limited to,

a.    Freedom from unreasonable seizure of her person; and

b.    Freedom from illegal detention and deprivation of her liberty without due process of law.

71.    When Defendants GREGORY GOSSELIN, WILLIAM McCLELLAND, DALE DEAR, ROBERT LEWIS, III, J.J. CARROLL, JACQUES PAN-KITA and ROBERT GUTH, III entered TRACI'S home they were engaged in the operational task of responding to a 911 call for medical assistance for a medical seizure and none of the officers that entered TRACI'S home were engaged in any duty related to the duty to investigate and uncover criminal activity, as such, their actions did not fall within the scope of their discretionary authority.

72.    After law enforcement arrived to allegedly assist TRACI with ANTHONY'S serious

Page 19 of 39

medical emergency she was not asked help keep her husband calm for his own safety, but was ordered to "stay away." Even when she stated she wanted to retrieve her phone from her bedroom to call ANTHONY'S mom about his seizure she was told to "[C]lear the area". She was denied any access to her husband, who had committed no crime, by the law enforcement officers that were in her home supposedly because they were going to "help" her and ANTHONY.

73.     Eventually TRACI was able to get to her bedroom to call ANTHONY'S mother. While doing so, she was confronted by an officer that loudly and aggressively demanded to know who she was calling. After telling the officer who she was calling, he aggressively demanded to know who she was calling two more times.

74.     Another officer confronted TRACI and kept demanding to know why she thought her husband was having a seizure and told her repeatedly and aggressively that ANTHONY was on drugs and she needed search her home and find his hiding places. He refused to believe her when she told him her husband did not do drugs. He, and every other officer in her home, told her ANTHONY was on drugs.

75.     Officers on the scene prevented TRACI from saying good-bye to her husband after he was loaded into the ambulance by EMS and told her not to go to the hospital because she would not be allowed to see ANTHONY.

76.     After ANTHONY was transported, Defendants GOSSELIN and McCLELLAND told TRACI her husband was on drugs. They wanted a statement from her and when she told them she had gone to bed at 8:30 PM and ANTHONY had gone to bed at 9:30 PM after watching "Shark Tank," they told her that was when ANTHONY took the drugs.

77.     TRACI told Defendants GOSSELIN and McCLELLAND and more than one other officer,

and there were a lot of officers present in her home, that ANTHONY was having a seizure and

every officer said no, ANTHONY was on drugs and asked why she thought her husband was

having a seizure when he was on drugs.

78.    Defendant DEAR said you could see the fear "come out of her body," because she

appreciated that they were there to help her help ANTHONY. In fact, TRACI was terrified of the

officers in her home and what they were doing to her husband.

79.    Defendant DEAR also claimed no other deputies, except himself and Defendants

GOSSELIN and McCLELLAND came into TRACI'S home. In fact, numerous law enforcement

officers, including Defendant PAN-KITA, not only came into TRACI'S home, but remained at

and in TRACI'S home for more than an hour after ANTHONY was transported, questioning her

about ANTHONY'S drug use and asking her what drugs he took.

80.    The unlawful questioning and seizure of TRACI about drugs and drug use served no

medical emergency responder purpose but rather was an investigation into wrong-doing and a

seizure without probable cause and was unreasonable under the circumstances and a violation of

TRACI'S constitutional rights under the Fourth Amendment.

81.    As a direct and proximate result of the unconstitutional conduct of Defendants

GREGORY GOSSELIN, WILLIAM McCLELLAND, DALE DEAR, ROBERT LEWIS, III, J.J.

CARROLL, JACQUES PAN-KITA and ROBERT GUTH, III, TRACI has suffered damages from

emotional distress, personal humiliation and mental anguish and suffering, and she has suffered

the loss of her capacity for the enjoyment of life.

82.    TRACI has been required to engage the services of the undersigned counsel and to pay her

a reasonable fee for her services, and she is entitled to reimbursement therefore from Defendants

GREGORY GOSSELIN, WILLIAM McCLELLAND, DALE DEAR, ROBERT LEWIS, III, J.J.

CARROLL, JACQUES PAN-KITA and ROBERT GUTH, III  pursuant to the provisions of 42

U.S.C. Section 1983.

**WHEREFORE,** Plaintiff, TRACI ANN SARTORI, demands judgment for damages

against Defendants GREGORY GOSSELIN, WILLIAM McCLELLAND, DALE DEAR,

ROBERT LEWIS, III, J.J. CARROLL, JACQUES PAN-KITA and ROBERT GUTH, III, together

with pre-judgment interest, interest, attorneys fees, costs of the action, and TRIAL BY JURY.

<u>**COUNT IV**</u>

<u>**Violation of Civil Rights of ANTHONY SARTORI Against Sheriff KEVIN RAMBOSK for Failure to Train Pursuant to 42 U.S.C. §1983**</u>

83.    Plaintiff realleges the allegations of paragraphs 10-37, 43-48 and 59-63 above, as if fully set forth herein and further alleges:

84.    At all material times Defendant KEVIN RAMBOSK ("RAMBOSK") or his appointed agents, was responsible for the Collier County Sheriff's Department, its agents and employees, including establishing and implementing policies and procedures for the training of employees to conform their conduct to the United States Constitution and the laws of the State of Florida.

85.    When Defendant RAMBOSK implemented a policy and established operational procedures for his law enforcement officers to respond to calls for an ambulance in medical emergencies that did not involve any duty related to the duty to investigate and uncover criminal activity, he did not establish adequate training programs to insure his officers were properly trained to implement the operational procedures he had established for responding to 911 calls in medical emergencies.

86.    Defendant RAMBOSK'S conscious choice not to train his officers to respond properly to

911 calls for medical seizures evidences a deliberate indifference to the rights of those persons, including ANTHONY, with whom his deputies came into contact when responding to a 911 medical emergency call for a person having a siezure.

87.     Defendant RAMBOSK'S decision to have his officers respond to 911 medical emergency calls for persons having seizures, and the failure to provide adequate training to those officers that respond to those calls despite the obvious need for such training, represents a policy for which Defendant RAMBOSK is responsible and for which he is liable under §1983 for the injuries that result from the policy.

88.     The Collier County Sheriff Department's current training for seizures, found in Unit 4, "Medical Issues, Seizures" of *CMS First Aid for Criminal Justice Officers*, states that a person having a seizure may exhibit signs and symptoms that resemble drunkenness or drug overdose and in some cases a person may show signs of aggression.  The officer is cautioned not to make assumptions.  It lists nine causes of seizure, including alcohol and drug related poisoning and "unknown causes."  It specifically states: "Do not restrain the patient."  The curriculum includes no other cautions regarding the use of force on persons having seizures.

89.     That Defendant RAMBOSK knew with certainty that his officers would be required to respond to 911 calls for medical emergencies, including seizures, and knew there was an obvious need for more and adequate officer training to avoid violation of a person's constitutional rights when responding to a 911 medical emergency call for a person having a seizure is illustrated by the constant drumbeat of professional law enforcement reports Defendant RAMBOSK has received in recent years regarding medical training for responding to those seizure emergencies.

90.     Professional law enforcement associations nationwide have recognized that today law

enforcement is often first on the scene of a 911 call, despite a specific family request for an ambulance. Defendant RAMBOSK has had actual and constructive notice of the plainly obvious need to improve the training of his law enforcement officers that respond to assist in medical emergency calls for seizures, particularly since deputies are now equipped with tasers. He has had actual and constructive notice that the use of the taser and the use of physical restraint tactics on persons suffering a seizure or in the postictal state are potentially deadly to the person suffering a seizure and he has deliberately chosen to ignore the need to train his officers in the proper response to a seizure and that deliberate choice not take any action constitutes deliberate indifference. Such a policy of failure to train his deputies that come into contact with persons suffering from a seizure or the postictal state has resulted in the violation of ANTHONY'S constitutional rights and physical and emotional injury to ANTHONY and constitutes a decision by Defendant RAMBOSK to violate the Constitution.

91.    The law enforcement community has been on notice for years that certain types of force are potentially deadly when assisting a person suffering from a seizure or the postictal state.

92.    Because one in ten persons will have a seizure sometime in his/her life and will likely call 911 when it happens, in the 1990's, the Epilepsy Foundation[3] developed a free on-line training curriculum for use by law enforcement agencies with the stated goals to increase officer awareness and recognition of seizures disorders, to review safety and first-aid guidelines and to support the officer's priorities and protect the rights of the individual having a seizure.

   a.    The training program describes the types of seizures and how a generalized, grand mal or focal seizure might appear to the officer; with symptoms including confusion, wandering,

---

   [3]    Epilepsy Foundation, *It Could Be Epilepsy.*

outbursts and clumsy, undirected violence.

   b.      It teaches the responding officer that a person having a seizure is unaware of

his/her actions, unable to control his/her body; unable to respond to questions or directions from

others and incapable of organized thought. The recommended officer response is to maintain a

calm demeanor, avoid verbal confrontation or physical restraint of the individual and to clear

away obstacles that may cause injury. It cautions to never forcibly restrain the person and to

insure supervision during post-seizure confusion.

   c.      The training program warns against certain dangerous procedures for a person

suffering a seizure including tasing, restraining or holding the person and keeping a person face

down during or following a seizure. On the use of a taser, the Foundation warns that a person

having a seizure is not able to respond to verbal instructions and should be managed cautiously to

avoid triggering further agitation.

93.    A 2008 Report entitled, *"Less Than Lethal. The Use of Stun Weapons in US Law

Enforcement,"*[4] was prepared by Amnesty International because police are often the first

responders on the scene of a medical emergency, despite a family request for an ambulance and

the Report supported the 2005 PERF[5] guidelines that law enforcement agencies develop

appropriate medical protocols for responding officers.

The Report:

   a.      Documented evidence that US law enforcement agencies deploy CED's[6] as a

---

[4]      Amnesty International Publications 2008.

[5]      Police Executive Research Forum

[6]      Controlled Electronic Devices

relatively low-level force option to subdue non-compliant individuals who do not pose a significant threat and are suffering from medical conditions such as epileptic seizures despite the known risk of death or serious injury from CED's. It included further evidence that despite warnings for several years of the potential health risks from such deployment, many such individuals are exposed to multiple or prolonged shocks, often more than the standard five second cycle.

b.    Documented evidence that the use of tasers has lowered the threshold at which force is used, including the use of tasers on unarmed individuals who do not immediately comply with instructions or continue to struggle while being placed in handcuffs. The Report concluded that the use of tasers to subdue non-compliant individuals who do not pose a serious immediate threat to themselves or others is an unnecessary and disproportionate use of force which can sometimes amount to cruel and degrading treatment.

c.    Included evidence that law enforcement uses tasers on people suffering from epileptic or diabetic seizures after mistaking the symptoms for non-compliant, combative or intoxicated behavior which, apart from being an inappropriate use of force, could cause serious harm. The Report found that people suffering from seizures had died after being shocked and subjected to other forms of restraint, including hog-tying, which are known to restrict the flow of blood to the brain and create a risk of death from asphyxia.

f.    The Report cited the concerns of the Epilepsy Foundation about police use of force in such cases, noting that involuntary, aggressive behavior is not unusual when someone is recovering from a seizure and that restraint of persons soon after a seizure may exacerbate or precipitate combativeness as well as increase the risk of injury or death. It warned that

handcuffing was a dangerous procedure that could lead to further agitation and struggling and cause asphyxiation or cardiac arrest.

g.    The 2008 Report also noted that the Epilepsy Foundation had developed a free training curriculum for police that warned against the use of restraints on individuals recovering from a seizure and advised law enforcement to leave the person suffering a seizure to recover as calmly as possible.

h.    The Report noted  the use of tasers was often contrary to 2005 guidelines for CED's developed by US standard-setting bodies such as the International Association of Chiefs of Police (IACP)  and PERF, including subjecting the individual to repeated and prolonged shocks and that in many agencies such practices on persons suffering seizures were still found not to violate departmental policy.  Presently, such use of a taser does not violate Collier County department policies.

94.    A 2011 Report entitled, *Electronic Control Weapons Guidelines*, published by PERF and COPS[7] established Guidelines for the responsible and accountable use of ECW's.[8]  It included:

a.    A warning about the serious and fatal outcomes that have been associated with ECW use and certain medical conditions.  The warning was specific regarding repeated and multiple applications and cycling times that exceeded 15 seconds in duration, whether the time is

---

[7]    Police Executive Research Forum and Community Oriented Policing Services, U.S. Department of Justice.  This widely-circulated Report continues to be used as a benchmark for law enforcement agencies.  Its guidelines on taser use were specifically cited in the December, 2014 report, *Investigation of the Cleveland Division of Police*, by the United States Department of Justice, Civil Rights Division, and the *Interim Report of the President's Task Force on 21st Century Policing*, March, 2015.

[8]    Electronic Control Weapons

consecutive or cumulative and that such use should be avoided. [9]

      b.      A warning that personnel should be trained regarding the medical complications that may occur with ECW use and that personnel should be made aware persons in medical crisis and persons under the influence of drugs and in a state of excited delirium may be at a heightened risk of serious injury or death when subjected to ECW applications and other uses of force to subdue them.

      c.      A warning that agencies need to train personnel about how positional asphyxiation[10] may exacerbate the condition of any individual that has received ECW application and that agencies should train personnel to use restraint techniques that do not impair a subject's respiration following ECW application.

      d.      A recommendation that agencies should consult with local medical personnel to develop appropriate police-medical protocols for medical evaluation and should not rely solely on the training curriculum provided by an ECW manufacturer as is the case in Collier County.

      e.      A recommendation that a use of force investigation should be initiated when a subject has received prolonged ECW application (longer than 15 seconds) and when a subject in an at-risk category has been subjected to ECW application.

      f.      A recommendation that agencies collect the information about each ECW use

---

[9]      The Report cited the 2008 Report by Amnesty International that found 351 persons had died in the US between June 2001 and August 2008 after being subjected to ECW activations by police.   (See paragraph 93, *supra*)

[10]      Positional asphyxia is a death that occurs when a subject's body position interferes with breathing, either when the chest is restricted (as with prone restraint) or when the position of the subject's head obstructs the airway.

including, the level of aggression encountered, whether the subject possessed any weapons, the type of crime/incident that was involved in and the type of clothing worn by the subject.

95.    The 2011 PERF and COPS Guidelines stated that at publication, two-thirds of the reporting agencies indicated their written policies strongly discouraged the use of an ECW on persons in at-risk categories except in exigent circumstances.  There is no such written policy regarding at-risk individuals within the Collier County Sheriff's Department.

96.    Even Taser International's training materials, utilized by the Collier County Sheriff's Department, include the following points:

    a.    A caution against exceeding 15 second CEW exposure (multiple applications or continuous) without justification, citing to the PERF, COPS and DOJ March 2011 Report (outlined above), an IACP[11] April 2010 Report, an American Academy of Emergency Medicine May 2011 Report, a National Institute of Justice May 2011 Report and a Civil Rights Division, DOJ, December 2012 Report.  Taser specifically cites to PERF Guideline 21 that ECD exposure for longer than 15 seconds may increase risk of serious injury or death.[12]

    b.    Citing the 4th Amendment, and contrary to Collier County policy, Taser warns that CEW in dart mode constitutes an "intermediate level of force" that must be justified by a strong governmental interest and that CEW against a non-violent misdemeanent who appears to pose no immediate threat and who is given no warning, is unconstitutional excessive force.

    c.    Taser warns that any decision to apply multiple CEW applications must take into consideration whether a suspect is capable of complying with an officer's command, cautions on

---

[11]    International Association of Chiefs of Police

[12]    ANTHONY received 75 seconds of CEW exposure.

the use of a Taser when a person is epileptic or suffering a seizure disorder, including postictal

state and encourages the development of policies including "stay off/get off."

     d.     Taser even warns that a person having a seizure will be perceived as the victim of a

force response to that seizure and courts may consider what officers knew about the suspect's

health when looking at the reasonableness of the use of force.

97.     All these Reports, and many more not listed or referenced here, included warnings about

dangerous uses of force on persons having a seizure and warnings to develop appropriate

guidelines for responding to a medical emergency for a person having a seizure that were ignored

by Defendant RAMBOSK.  Defendant RAMBOSK'S failure to train his officers resulted in

unconstitutional and potentially lethal force being used by his officers against ANTHONY during

this incident.

98.     The result of the Department's failure to train is starkly illustrated by the entire Sheriff

Department's complete ignorance of the potentially deadly force employed by Defendants

GOSSELIN, McCLELLAND and DEAR on ANTHONY while he was having a seizure or in the

postictal state when the Department conducted the Use of Force investigation of the incident and

when it investigated ANTHONY'S misconduct complaint.

**Use of Force Report**

     The Report indicates the Deputies responded to a "possible seizure" and the service being

rendered was "law enforcement" - not first responder medical response.  The Report manufactures

a claim that ANTHONY "attacked deputies" and admits to four tasings of ANTHONY because he

did not obey an order to "stay on the ground." It admits to "controlling" ANTHONY'S upper

body and legs and handcuffing ANTHONY.  It does not state how the deputies "controlled"

ANTHONY, nor does it mention the attempts to hog-tie him. It says the force used was "restraint

devices" and "other." There is no taser download attached to verify the number of shocks and total

duration of electrical exposure ANTHONY received and the only questions from the two

sergeants who reviewed the Report were about whether photos were taken and whether Defendant

McCLELLAND was a witness or officer-involved. Defendant GOSSELIN falsely stated in the

Report that TRACI "ran away to the bedroom when ANTHONY became combative." No one

questioned whether any use of force was permissible on a man in medical crisis that had broken

no laws and where deputies did not claim to be in fear for their safety. No one appeared to know

what the response should have been to a person suffering a seizure in the Report. No one even

appeared to know that the officers did not follow their own Department's current minimal training

prohibition against the restraint of ANTHONY.

**Professional Responsibility Bureau Report (PRB Report)**

ANTHONY filed a Complaint with the Collier County Sheriff Department regarding his

treatment on October 22, 2014 by Defendants GOSSELIN, McCLELLAND and DEAR after his

wife had called 911 for an ambulance. The PRB Report states the deputies were confronted by a

person "who seemed to be under the influence of narcotics" despite admitting they were

dispatched on a medical call for a person having a seizure. The Report admits the deputies

responded to the seizure call with use of the taser, verbal direction, restraint devises, transporters

and takedowns. Because of the Complaint, Defendant GOSSELIN'S taser cycles on that date

were finally downloaded from his taser. The Report concludes the response of the deputies was

lawful, reasonable and within policy. The only issue raised in the Report was the seven tasings

for a total of 75 seconds of exposure within a two minute period that ANTHONY received. This

extreme, unlawful and potentially deadly use of force by Defendant GOSSELIN was excused

because there was no evidence that "the discrepancy in the number of taser cycles [admitted to by

Defendant GOSSELIN in his Incident Report and Use of Force statement] was intentional and the

discrepancy was plausible given the 'intense nature' of the incident." The PRB Report was

reviewed by a Chief, a Captain and a Lieutenant. Not the Chief, not the Captain nor the

Lieutenant questioned whether any use of force was reasonable on a man that had committed no

crime by deputies that did not say they were in any fear for their safety. Not a single sentence in

the Report mentions the fact that the deputies did not engage ANTHONY in those ways

appropriate to a medical emergency for a seizure or even according to existing Department

guidelines. There wasn't any mention because not a single officer from the Chief down knew how

the deputies should have responded to a seizure call, nor did they know that their response was

contrary to established medical protocols for dealing with seizures. No one from the Chief down

knew the deputies by their own actions, created the chaos in ANTHONY'S home, exacerbated

ANTHONY'S serious medical condition and employed force that was potentially lethal to

ANTHONY. There was no mention of the potentially deadly prone restraint they used, the danger

and resulting damage from handcuffing ANTHONY and the attempt to hog-tie ANTHONY. No

one was asked, and no one admitted to administering fist strikes to ANTHONY'S kidney region

for pain compliance, despite the photographic evidence of the bruising. Not a single reviewing

officer, from the Chief down, knew that the force used on ANTHONY was potentially lethal and

unconstitutional.

99.    One in ten persons will suffer a seizure from some cause in his/her lifetime and a 911 call

is the likely result. The reason all national law enforcement organizations have focused on the

appropriate response to a seizure is because there is absolutely no doubt that all law enforcement officers will be dispatched to a 911 call and will encounter this medical emergency at some time and persons have died from uninformed law enforcement responses.  Despite warnings as early as the 1990's, no officer, including upper management, in the Collier County Sheriff's Department knew how deputies should respond to a 911 call for a man experiencing a seizure.

100.    Defendant Sheriff RAMBOSK was on notice and knew of the obvious need to train his officers in the appropriate response to a person having a seizure and his deliberate choice not to train his deputies in the proper procedures and the prohibited uses of force in response to a medical emergency involving a seizure or postictal state of seizure, and the known and obvious consequences of that failure to train, resulted in the violation of ANTHONY'S constitutional rights while having a seizure, and caused permanent physical and emotional  injury to ANTHONY.

101.    The need for further and specific training and the failure of Defendant RAMBOSK to implement such training, constituted a deliberate indifference to the health, safety and welfare of ANTHONY.

102.    As a direct and proximate result of Defendant RAMBOSK'S unconstitutional policy, ANTHONY has suffered damages including bodily injury and the resulting physical pain and suffering, post traumatic stress disorder, emotional distress and mental anguish and suffering, and he has suffered the loss of his capacity for the enjoyment of life. Some of ANTHONY'S injuries are permanent or continuing and he will continue to suffer in the future.

103.    ANTHONY has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and he is entitled to reimbursement therefore from

Defendant RAMBOSK pursuant to the provisions of 42 U.S.C. Section 1983.

**WHEREFORE,** Plaintiff, ANTHONY RYAN SARTORI demands judgment for damages

against Defendant KEVIN RAMBOSK, together with pre-judgment interest, interest, attorneys

fees, costs of the action, and TRIAL BY JURY.

## STATE LAW CLAIMS

## COUNT V

### Claim for Battery Against GREGORY GOSSELIN, WILLIAM McCLELLAND and DALE DEAR

104.    Plaintiff realleges the allegations of paragraphs 10-37, 42-43, 59 and 61 above, as if fully

set forth herein and further alleges:

105.    At all relevant times, Defendants GOSSELIN, McCLELLAND and DEAR were acting

within the scope of their employment with the Collier County Sheriff's Department and were

engaged in responding to a 911 medical emergency call best described as operational in nature.

106.    Defendant GOSSELIN battered ANTHONY, who had no weapon, had not committed any

crime, had not threatened anyone and who did not pose a threat of serious physical harm to the

officers or others, when he used excessive and unreasonable and potentially deadly force in

deploying his taser to the mostly naked ANTHONY, seven times for a total of 75 seconds of

electrical exposure in less than two minutes while ANTHONY was suffering from a seizure or the

postictal state, and such force was unreasonable and excessive under the circumstances.

107.    Defendants GOSSELIN, McCLELLAND and DEAR battered ANTHONY when they used

excessive and unreasonable and potentially deadly force in placing the mostly naked ANTHONY,

who had no weapon, had not committed any crime, had not threatened anyone and who did not

pose a threat of serious physical harm to the officers or others who had broken no law and posed

no threat to the deputies, in a prone restraint by physically laying on top of his upper and lower torso, when, on information and belief, they administered fist strikes to his kidney region for pain compliance, when they handcuffed him and when they tried to hog-tie him before being stopped by EMS and such force was unreasonable and excessive under the circumstances.

108.    Defendants GOSSELIN, McCLELLAND and DEAR acted intentionally and without justification when they tased ANTHONY seven times, placed ANTHONY in a prone restraint by physically laying on top of his upper and lower torso, administered fist strikes to his kidney region for pain compliance, handcuffed him and tried to hog-tie him.  Their actions were either intended to cause injury or substantially certain to result in injury to ANTHONY, solely for the purpose of controlling a medically compromised man wearing nothing but plaid boxer shorts that had violated no law and posed no danger to the Defendants or the public in his own home.

109.    As a direct and proximate result of the conduct of GREGORY GOSSELIN, WILLIAM McCLELLAND and DALE DEAR, ANTHONY has suffered damages including bodily injury and the resulting physical pain and suffering, post traumatic stress disorder, emotional distress and mental anguish and suffering, and he has suffered the loss of his capacity for the enjoyment of life. Some of ANTHONY'S injuries are permanent or continuing and he will continue to suffer in the future.

**WHEREFORE**, Plaintiff, ANTHONY RYAN SARTORI, demands judgment for damages against Defendants GREGORY GOSSELIN, WILLIAM McCLELLAND and DALE DEAR, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

## COUNT VI

### Claim for Battery Against SHERIFF KEVIN RAMBOSK

110.    Plaintiff realleges the allegations of paragraphs10-37, 42-43, 59 and 61 above, as if fully set forth herein and further alleges:

111.    ANTHONY suffered harmful and offensive contacts when he was tased multiple times by Defendant GOSSELIN and suffered further harmful and offensive contacts when he was placed in prone restraint and handcuffed and, on belief, endured fist strikes for pain compliance by Defendants GOSSELIN, McCLELLAND and DEAR.

112.    At the time, Defendants GOSSELIN, McCLELLAND and DEAR were acting within the scope of their employment with the Collier County Sheriff's Department.

113.    Defendants GOSSELIN, McCLELLAND and DEAR acted intentionally, but not in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety or property and their actions were not objectively reasonable.

114.    Pursuant to Section 768.28(9), *Fla. Stat.*, Defendant RAMBOSK is vicariously liable, but Defendants GOSSELIN and McCLELLAND are not personally liable, for their battery of ANTHONY.

115.    As a direct and proximate result of the battery of ANTHONY by Defendant RAMBOSK'S employees, ANTHONY has suffered damages including bodily injury and the resulting physical pain and suffering, post traumatic stress disorder, emotional distress and mental anguish and suffering, and he has suffered the loss of his capacity for the enjoyment of life. Some of ANTHONY'S injuries are permanent or continuing and he will continue to suffer in the future.

WHEREFORE, Plaintiff, ANTHONY RYAN SARTORI, demands judgment for damages

Page 36 of 39

against Defendant KEVIN RAMBOSK, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

## COUNT VII

### Claim for Negligence Against SHERIFF KEVIN RAMBOSK

116.    Plaintiff realleges the allegations of paragraphs 10-37 above, as if fully set forth herein and further alleges:

117.    Defendant RAMBOSK, acting through his officers, owed a duty of care to ANTHONY and TRACI when his officers responded to a 911 call for assistance with a seizure.

118.    The officers were not at ANTHONY'S home to enforce any law and were not engaged in protection of the general public, but instead were allegedly there to provide a medical service to ANTHONY.  Responding to a 911 call for medical emergency assistance was within the scope of the officers' employment and operational in nature.

119.    Having undertaken to respond to the 911 call for medical emergency assistance, and having engaged ANTHONY and TRACI directly to provide emergency medical assistance, the officers had a duty to act with reasonable care and they failed to exercise reasonable care in providing emergency medical assistance to ANTHONY and TRACI, including, but not limited to: the refusal to respect the dispatch diagnosis of seizure without further investigation, the failure to understand that ANTHONY'S physical movements were involuntary and something he could not control because he was having a seizure, shouting orders at ANTHONY who could not understand what he was being ordered to do and could not comply, deploying a taser to ANTHONY seven times for a total of 75 seconds of electrical exposure during a two-minute period, which caused a predicable reflexive aggressive response from ANTHONY, placing ANTHONY in a prone restraint position

by laying on ANTHONY while he was face down on the tile floor to "contain" him, administering

fist strikes to his kidney region and handcuffing and attempting to hog-tie ANTHONY while he

was having a seizure or postictal, all of which increased the danger and risk of harm to

ANTHONY.

120.    The officers' attempts to "control" ANTHONY before EMS was on the scene so "EMS

could render assistance to him," and their refusal to accept or even consider TRACI'S and

dispatch's information that ANTHONY had suffered a seizure, caused a  delay in EMS'S entry and

a delay in appropriate medical treatment for ANTHONY.

121.    Defendant RAMBOSK, through his officers, breached the duty of care he owed to

ANTHONY and TRACI when his officers responded to the 911 call for emergency medical

assistance for a seizure in a negligent and unreasonable manner and that breach caused

ANTHONY permanent physical and emotional damage and caused TRACI emotional damage.

122.    As a direct and proximate result of Defendant RAMBOSK'S negligence, ANTHONY has

suffered damages including bodily injury and the resulting physical pain and suffering, post

traumatic stress disorder, emotional distress and mental anguish and suffering, and he has suffered

the loss of his capacity for the enjoyment of life. Some of ANTHONY'S injuries are permanent or

continuing and he will continue to suffer in the future.

123.    As a direct and proximate result of Defendant RAMBOSK'S negligence, TRACI has

suffered damages from emotional distress, personal humiliation and mental anguish and suffering,

and she has suffered the loss of her capacity for the enjoyment of life.

        **WHEREFORE,** Plaintiffs, ANTHONY RYAN SARTORI and TRACI ANN SARTORI

demand judgment for damages against Defendant Sheriff KEVIN RAMBOSK, together with pre-

judgment interest, interest, costs of the action, and TRIAL BY JURY.

Dated this _5th_ day of March, 2018.

By:_____

**COLLEEN J. MacALISTER, Esq.**
Florida Bar No.: 0804711

**Law Offices of Colleen J. MacAlister, P.A.**
5061 Napoli Drive
Naples, Florida 34103
Phone: (239) 262-3760
FAX:   (239) 790-5779
colleen@cjmaclaw.com
Attorney for Plaintiffs